E-FILED
Thursday, 21 April, 2022  06:08:02 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois,<br><br>          Plaintiff,<br><br>v.<br><br>3M Company, a Delaware Corporation,<br><br>          Defendant. | **CASE NO.  22-cv-4075**<br><br>**NOTICE OF REMOVAL** |

Defendant 3M Company ("3M"), by undersigned counsel, hereby gives notice of removal of this action, pursuant to 28 U.S.C. §§ 1441, 1442(a)(1) and 1446, from the State of Illinois Circuit Court of the Fourteenth Judicial Circuit, Rock Island County, to the United States District Court for the Central District of Illinois. 3M is entitled to remove this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). As further grounds for removal, 3M states as follows.

**PRELIMINARY STATEMENT**

1.     The State of Illinois ("State") brought this action seeking to hold 3M liable for its alleged conduct in manufacturing and discharging per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctane sulfonate ("PFOS") and perfluoro-octanoic acid ("PFOA"), from a 3M manufacturing facility in Cordova, Illinois ("Cordova Facility") located on the banks of the Mississippi River. 3M's manufacture and discharge of PFAS at the Cordova Facility purportedly has resulted in alleged contamination of the State's environment and natural resources. *See* Ex. A, Summons and Complaint, at Complaint p. 1. The State seeks to recover for *all* damages to the

State's environment and natural resources caused by the release of PFAS from 3M's Cordova Facility (*see id.*), including for alleged contamination of the Mississippi River (*see id.* ¶¶ 105, 191).

2.    But PFAS releases elsewhere on the Mississippi River, including releases of PFOS and PFOA, likely resulted from the use, storage, and/or disposal of PFAS-containing aqueous film-forming foams ("AFFF") that 3M developed for sale to the U.S. military in accordance with rigorous military specifications ("MilSpec").  Use of MilSpec AFFF at the Rock Island Arsenal— located 25 miles downstream from the Cordova Facility—plausibly contributed to the alleged harm to the State's environment and natural resources from PFAS. *See* Ex. B, *Draft Final VIA Preliminary Assessment and Site Inspection of Per- and Polyfluoroalkyl Substances, Rock Island Arsenal, Illinois*, prepared for the U.S. Army Corps of Engineers (Feb. 2021) ("RIA PA/SI").[1]

3.    Because this action seeks damages for all Illinois natural resources allegedly contaminated with PFAS from the Cordova Facility—including downstream areas of the Mississippi River—the alleged contamination for which the State is seeking damages plausibly may encompass and overlap with PFAS contamination from the use, storage, and discharge of MilSpec AFFF at the Rock Island Arsenal.  To the extent that the State's alleged damages arise from MilSpec AFFF, 3M intends to assert the federal government contractor defense in this action. Although the Complaint purports to allege that "PFAS, as defined in this Complaint, do *not* include any PFAS that have contaminated Illinois' environment or natural resources from aqueous film-forming foams ('AFFF')" (Ex. A, Complaint ¶ 11), this allegation cannot prevent 3M "from raising the production of MilSpec AFFF as a defense or an alternate theory" of causation. *Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021).

---

[1]    Exhibit B was produced by the United States in the *In re Aqueous Film-Forming Foams ("AFFF") Products Liability Litigation*, MDL No, 2873, pending in the U.S. District Court for the District of South Carolina.

4.      Under the federal officer removal statute, 3M is entitled to remove this action to have its federal defense adjudicated in a federal forum, as multiple courts have held in other PFAS cases including cases filed by other state attorney-generals. *See Nessel*, 2021 WL 744683, at *4 (denying State of Michigan's motion to remand); *In re Aqueous Film-Forming Foams Prods. Liab. Litig.* ("*In re AFFF*"), No. 2:18-mn-2873, 2019 WL 2807266, at *2 (D.S.C. May 24, 2019) (denying State of New York's motion to remand). Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008); *see Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (federal officer removal "covers situations . . . where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete").

**THE STATE'S SUMMONS AND COMPLAINT**

5.      The State filed this action on March 16, 2022, in the State of Illinois Circuit Court of the Fourteenth Judicial Circuit, Rock Island County, bearing Case No. 2022LA16. *See* Ex. A, Summons and Complaint. 3M was served with the Summons and Complaint on March 22, 2022. *See id.* at Notice of Service of Process.

6.      The Complaint pleads that the State has brought this action to hold 3M liable "for its operation of . . . its Cordova Facility in Rock Island County, Illinois" and "its discharge . . . of [PFAS] from the Cordova Facility." Ex. A, Complaint p. 1.

7.      The State alleges that 3M has owned and operated the Cordova Facility (located on the banks of the Mississippi River) since the 1970s, and that 3M manufactured and disposed of PFAS and PFAS-containing products from the Cordova Facility, allegedly resulting in PFAS contamination of the State's environment and natural resources "at and around" the facility. *Id.* ¶ 105; *see id.* ¶¶ 34-48, 74. The Complaint specifically alleges that 3M has discharged PFAS from

3

the Cordova Facility into the Mississippi River (*id.* ¶¶ 105, 107-108, 129-136), and that PFAS has migrated into the environment from the Cordova Facility (*id.* ¶¶ 143, 178), causing contamination of the State's groundwater, surface waters, wetlands, and wildlife (*id.* ¶¶ 145-180), including the Mississippi River (*e.g.*, *id.* ¶ 129-136, 190-192).

8.    Among other forms of relief, the State seeks "monetary damages for the cost of identifying, monitoring, and remediating contamination caused by the release of PFAS from 3M's Cordova Facility and all damages to the State's environment and its natural resources because of the resulting contamination." *Id.* at p. 1. That encompasses purported damages for all alleged contamination "at and around" the Cordova Facility (*e.g.*, *id.* ¶ 248, 259), such as downstream harms caused by PFAS from the Cordova Facility, including damages to "groundwater, surface waters, wetlands, drinking water supplies, biota, wildlife, aquatic life, and their associated soils, sediments, and uses, and other State natural resources and property" (*id.* at p. 61).

9.    Based on allegations concerning 3M's manufacture and discharge of PFAS chemicals in the State of Illinois, the State asserts claims against 3M for multiple counts of violations of the Illinois Environmental Protection Act, 415 ILCS 5/1, *et seq.* (*id.* ¶¶ 181-232), for restoration under the Fish and Aquatic Life Code, 515 ILCS 5/5-5, and the Wildlife Code, 520 ILCS 5/1-10 (*id.* ¶¶ 233-244), and for negligence (*id.* ¶¶ 245-248), trespass (*id.* ¶¶ 249-259), public nuisance (*id.* ¶¶ 260-264), and unjust enrichment (*id.* ¶¶ 265-276).

## THE PROCEDURAL REQUIREMENTS FOR REMOVAL UNDER 28 U.S.C. §§ 1441 AND 1446 ARE MET

10.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 93(b) and 1441(a) because the State of Illinois Circuit Court of the Fourteenth Judicial Circuit, Rock Island County, is located within the Central District of Illinois.

4

11.     Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Summons and Complaint are attached hereto as Exhibit A.

12.     This Notice of Removal is being filed within 30 days of service of the Complaint on 3M. Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal is timely filed.

13.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for the State, and a copy is being filed with the Clerk of the State of Illinois Circuit Court of the Fourteenth Judicial Circuit, Rock Island County.

14.     By filing a Notice of Removal in this matter, 3M does not waive, and reserves, its right to assert any defenses and/or objections to which it may be entitled.

15.     3M reserves the right to amend or supplement this Notice of Removal.

16.     If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

## REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)

17.     Removal here is proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that it is a "(1) 'person' (2) 'acting under' the United States, its agencies, or its officers (3) that has been sued 'for or relating to any act under color of such office,' and (4) has a colorable federal defense to the plaintiff's claim." *Ruppel*, 701 F.3d at 1180-1181 (quoting 28 U.S.C. § 1442(a)); *accord Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 133-35 (1989); *Baker v. Atlantic Richfield Co.*, 962 F.3d 937, 941 (7th Cir. 2020); *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir. 2006).

18.    Removal rights under the federal officer removal statute, 28 U.S.C. § 1442, are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999). This is because the "basic purpose of § 1442(a)(1) is to ensure a federal forum for defenses of official immunity by federal officers." *Harris v. Rapid Am. Corp.*, 532 F. Supp. 2d 1001, 1004 (N.D. Ill. 2007). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). To the contrary, 28 U.S.C. § 1442 as a whole must be "liberally construed" in favor of removal. *Hammer v. U.S. Dep't of Health & Hum. Servs.*, 905 F.3d 517, 527 (7th Cir. 2018) (quoting *Watson v. Philip Morris Co., Inc.*, 551 U.S. 142, 147 (2007)); *see also, e.g.*, *Ayotte v. Boeing Co.*, 316 F. Supp. 3d 1066, 1072-1073 (N.D. Ill. 2018).

19.    As set forth below, all requirements for removal under § 1442(a)(1) are satisfied here. In many similar cases, including multiple cases filed by the New York Attorney General in the *In re AFFF* MDL pending before Judge Richard Gergel in the District of South Carolina, courts have ruled that removal under § 1442 was proper because the alleged contamination derived in part from MilSpec AFFF. *See, e.g.*, *In re AFFF*, 2019 WL 2807266, at *2 (denying State of New York motion to remand); Order 3-5, *In re AFFF*, No. 2:18-mn-2873, ECF No. 320 (D.S.C. Sept. 27, 2019) (same); *see also Ayo v. 3M Co.*, 2018 WL 4781145, at *7-15 (E.D.N.Y. Sept. 30, 2018) (denying plaintiffs' motion to remand and finding that federal officer removal was proper in case against 3M and other AFFF manufacturers).

A.    **MilSpec AFFF**

20.    Since the late 1960s/early 1970s, the United States military began using AFFF that meets military specifications ("MilSpec AFFF") on military bases, airfields, and Navy ships—

settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. Indeed, the U.S. Naval Research Laboratory developed AFFF (with some assistance from industry participants), and its researchers were granted the first AFFF patent in 1966.[2] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[3]

21.     The manufacture and sale of MilSpec AFFF is governed by rigorous military specifications created and administered by Naval Sea Systems Command. The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised a number of times since then.[4] All MilSpec AFFF products must be qualified for listing on the applicable Qualified Products List prior to military procurement. Prior to such listing, a manufacturer's products are examined, tested, and approved to be in conformance with specification requirements.[5] The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements. After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[6] Naval Sea Systems Command reserves the right to perform any of the quality assurance inspections set forth in the

---

[2]     U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[3]     U.S. Navy, NRL/MR/1001-06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the Roosevelts' Vision"), http://bit.ly/2mujJds.

[4]     The 1969 MilSpec and all its revisions and amendments through the April 2020 amendment (MIL-PRF-24385F(4)) are available at https://tinyurl.com/yxwotjpg.

[5]     Dep't of Defense SD-6, Provisions Governing Qualification 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[6]     Dep't of Defense SD-6, at 1.

specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements.

22.     From its inception until very recently, the MilSpec included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants"—the class of PFAS chemicals that includes PFOA and PFOS.[7] And although in 2019 the MilSpec removed the modifier "fluorocarbon" from "surfactants," it expressly states that "the DoD intends to acquire and use AFFF with the lowest demonstrable concentrations of . . . PFOS and PFOA" "[i]n the short term."[8] PFOA or PFOS are unavoidably present at some concentrations in some fluorocarbon surfactants used in MilSpec AFFF, and the current MilSpec expressly contemplates that AFFF formulations will contain PFOA and PFOS (subject to recently imposed limits).

23.     3M manufactured and sold MilSpec AFFF to the U.S. military for over three decades. One or more AFFF products manufactured by 3M were on the Navy's Qualified Products List for MilSpec AFFF from 1970 until 2010.

**B.     The Alleged Contamination Plausibly Derives In Part From MilSpec AFFF**

24.     The State brought this case seeking to recover for all damages to the State's environment and natural resources from PFAS contamination due to alleged releases from 3M's Cordova Facility, including releases into the Mississippi River. Although the Complaint purports to disclaim any recovery for PFAS contamination caused by AFFF (*see* Ex. A, Complaint ¶ 11), an environmental assessment of at least one military facility on the Mississippi River—the Rock Island Arsenal—demonstrates that the alleged contamination for which the State seeks to recover in this case encompasses PFAS contamination attributable in part to MilSpec AFFF. Despite the

---

[7]     *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017).

[8]     *See* MIL-PRF-24385F(3) §§ 3.2, 6.6 (2019).

State's disclaimer, 3M is entitled to a federal forum in order to "rais[e] the production of MilSpec AFFF as a defense or an alternate theory" of causation. *Nessel*, 2021 WL 744683, at *3.

25.     The Rock Island Arsenal is a U.S. military facility located on the banks of the Mississippi River approximately 25 miles downriver from 3M's Cordova facility.

26.     The U.S. Army prepared a Preliminary Assessment and Site Inspection of the Rock Island Arsenal pursuant to CERCLA (Comprehensive Environmental Response, Compensation, and Liability Act) to investigate PFAS contamination at that facility, including contamination from PFOS and PFOA. *See* Ex. B, RIA PA/SI at -1717. A report containing the results of the preliminary assessment and site inspection was completed in February 2021, and is attached as Exhibit B.

27.     The Army report identified multiple areas of potential interest ("AOPIs") where the use, storage, or disposal of PFAS-containing materials had occurred, and determined that elevated levels of PFOS and PFOA existed in the groundwater at many of those areas. *Id.* at -1717 to -1720. Those included AFFF storage warehouses and fire training areas. *Id.* at -1717 to -1718; *see also id.* at -1733 to 1735 (identifying "Fire-Related Area[s]" were AFFF was used or stored).

28.     The Army report explains that "AFFF-use and storage was identified at nine areas" of potential interest, including firefighting training areas and AFFF storage areas where AFFF is currently stored. *Id.* at -1736 to -1737. The report also identified an additional site, an "Old Landfill," where burn pits "indicate[d] the use of AFFF during fire training exercises." *Id.* at -1737. In addition, the report confirmed the use of AFFF during "two occurrences of the RIA Fire Department responding to offsite fires." *Id.* at -1738.

29.     The Army report also describes historical evidence that "firefighting foam operations [were] conducted in the Mississippi River" and that the "foam [was] released into the Mississippi River during training exercises."  *Id.* at -1717; *see also, e.g.*, *id.* at -1743 (same). The

report further explains that "[s]urface water runoff and/or groundwater associated with the AOPIs may discharge to the Mississippi River." *Id.* at -1762; *see id.* at -1763 (same); *id.* at -1764 (same); *id.* at -1765 (same); *id.* at -1766 (same); *see also id.* at -1736 ("seeps located in the Mississippi River" are "downgradient" from training areas where AFFF was used). The report acknowledges that "PFAS impacts from other sources" may have contributed to PFAS contamination of the Mississippi River from the Rock Island Arsenal. *Id.* at -1751.

30.    Because the Rock Island Arsenal is a U.S. military facility, any AFFF used, stored, or disposed at the Rock Island Arsenal would have been MilSpec AFFF.

31.    As a result, the elevated PFAS levels identified by the U.S. Army at and around the Rock Island Arsenal on the banks of the Mississippi River likely derive in part from the use, storage, and/or disposal of MilSpec AFFF at the Rock Island Arsenal.

32.    Because the Rock Island Arsenal is on the banks of the Mississippi River 25 miles downriver from 3M's Cordova facility, alleged downstream PFAS contamination of natural resources due to releases from the Cordova Facility into the Mississippi River could plausibly overlap with PFAS contamination identified by the U.S. Army that stems from the use, storage, or disposal of MilSpec AFFF at the Rock Island Arsenal.

33.    Accordingly, the alleged PFAS contamination for which the State seeks recovery in this action is plausibly attributable in part to MilSpec AFFF, and 3M is entitled to remove this case as a whole pursuant to federal officer jurisdiction. That is because "[i]t is entirely possible that Plaintiffs' injuries occurred from actions taken while Defendants were acting under color of federal office: namely, MilSpec AFFF," and the State "cannot prevent Defendants from raising the production of MilSpec AFFF as a defense or alternative theory." *Nessel*, 2021 WL 744683, at *3.

3M is entitled to raise "the production of MilSpec AFFF as a defense or alternative theory" to the State's allegations of PFAS contamination from the Cordova facility.

34.    The circumstances here are similar to those in *Ridgewood Water v. 3M*—an action in which the plaintiff alleged damages from PFAS contamination of its water supply. *See* Complaint, *Ridgewood Water v. 3M Comp.*, No. 2:19-cv-09651 ("*Ridgewood Water*"), ECF No. 1-2 (D.N.J. April 11, 2019). That action was removed to federal court based on federal officer jurisdiction and then transferred to the *In re AFFF* MDL. Judge Gergel denied the plaintiff's motion to remand. *See* Ex. C, Order Denying Remand (*In re AFFF*, No. 2:18-mn-2873, ECF No. 325 (D.S.C. Oct. 1, 2019)). As Judge Gergel acknowledged, the plaintiff in that case affirmatively disavowed any claim to recover for damages from contamination of its water supply due to MilSpec AFFF, but instead was purporting to bring suit to recover for PFAS contamination from other sources (including commercial or non-MilSpec AFFF). *Id.* at 2-3. But the removing defendants had shown that the contamination of the plaintiff's water supply was plausibly attributable in part to releases of PFAS from the use of MilSpec AFFF at a nearby airport. The plaintiff disputed that evidence (*see id.* at 3), but Judge Gergel concluded that federal officer removal was appropriate because the defendants "contend[ed] that the AFFF products were manufactured according to MilSpec" and thus had a "colorable" federal defense. *Id.* at 5. Federal officer removal is similarly appropriate here because the alleged PFAS contamination of natural resources downstream from the Cordova Facility is plausibly due in part to MilSpec AFFF.

**C.       All Four Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied**

**1.       The "Person" Requirement Is Satisfied**

35.    The first requirement for removal under the federal officer removal statute is satisfied here because 3M (a corporation) is a "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes "'companies, associations, firms, [and] partnerships.'"

*Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1); *see Betzner*, 910 F.3d at 1015 ("Corporations are persons under § 1442(a).").

### 2.  The "Acting Under" Requirement Is Satisfied

36.    The second requirement, "acting under" a federal officer, is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Watson*, 551 U.S. at 152; *see also Baker*, 962 F.3d at 942; *Ruppel*, 701 F.3d at 1181. "The words 'acting under' are to be interpreted broadly." *Isaacson*, 517 F.3d at 136. Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813.

37.    The requirement is met here because the alleged PFAS contamination plausibly stems in part from MilSpec AFFF, a vital product provided by 3M that otherwise "the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137; *see also Ruppel*, 701 F.3d at 1181. MilSpec AFFF is a mission critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)); *cf. Isaacson*, 517 F.3d at 137. The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[9]

38.    Accordingly, the military has long depended upon outside contractors like 3M to manufacture and supply AFFF. *See Nessel*, 2021 WL 744683, at *3 ("[I]f a private contractor is

---

[9]    *Fulfilling the Roosevelts' Vision* 37.

12

performing a job that 'in the absence of a contract with a private firm, the Government itself would have had to perform,' the contractor is acting under a federal officer. . . . This is a product that the Government would have had to create if Defendants[10] did not exist." (quoting *Watson*, 551 U.S. at 153-34)); *Ayo*, 2018 WL 4781145, at *8-9 (holding that 3M and other AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *In re AFFF*, 2019 WL 2807266, at *2 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military). If 3M and other manufacturers did not provide MilSpec AFFF for use by the military, the government would have to manufacture and provide the product itself. "Therefore, [3M] ha[s] satisfied the 'acting under' requirement of § 1442(a)(1)." *Nessel*, 2021 WL 744683, at *3.

39.     In designing, manufacturing and supplying MilSpec AFFF products, 3M acted under the direction and control of one or more federal officers. Specifically, 3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, the MilSpec AFFF products were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the United States Department of Defense.[11]

### 3.     The "Under Color Of Federal Office" Requirement Is Satisfied

40.     The third requirement, that a defendant's actions were taken "under color of federal authority," requires a "causal connection between the charged conduct and asserted official authority." *Ruppel*, 701 F.3d at 1181 (quoting *Jefferson Cty.*, 527 U.S. at 431). Like the "acting

---

[10]     The "Defendants" in the *Nessel* case include 3M.

[11]     *See* Dep't of Defense, SD-6, at 1.

under" requirement, "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at 137. Courts "credit Defendants' theory of the case when determining whether [this] causal connection exists." *Id.*[12]

41. To meet this requirement, "[d]efendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred *while* Defendants were performing their official duties." *Isaacson*, 517 F.3d at 137-138; *accord Baker*, 962 F.3d at 945; *see also id.* at 944 (Seventh Circuit has "join[ed] all the courts of appeals that have replaced causation with connection" for purpose of applying the "under color of federal office" requirement); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) ("[T]here need be only *a connection or association* between the act in question and the federal office." (internal quotation marks omitted)). The State's claims for PFAS contamination of natural resources downstream from the Cordova Facility plausibly arise in part from 3M's production and sale of AFFF manufactured according to military specifications established by the Department of Defense. Such MilSpec AFFF was then used, stored, or disposed by the U.S. military at installations in the State of Illinois, including at least at the Rock Island Arsenal, which are or have been required to employ MilSpec AFFF. As a result, the State's claims against 3M relate to acts taken under color of federal office because those claims encompass contamination from MilSpec AFFF. *See, e.g.*, *Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government."); *In re AFFF*, 2019 WL 2807266, at *2 ("Here, [Plaintiff]'s claims arise out of use of AFFF products that it claims [the defendant] manufactured and sold, and for which the U.S. military imposes MilSpec standards. The Court . . . finds that the causation element

---

[12] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990, 2011 WL 5109532, at *5 (S.D.N.Y. Oct. 21, 2011).

of federal officer removal is satisfied here."); *Nessel*, 2021 WL 744683, at *3 ("[I]t is entirely possible that Plaintiffs' injuries occurred from actions taken while Defendants were acting under color of federal office: namely, MilSpec AFFF."). "[I]t is enough for the present purposes of removal that at least some of the pollution arose from the federal acts." *Baker*, 962 F.3d at 945.

### 4.       The "Colorable Federal Defense" Requirement Is Satisfied

42.       The fourth requirement, a "colorable federal defense," is satisfied by 3M's assertion of the government contractor defense.

43.       At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original, citation omitted). In other words, "a colorable federal defense under § 1442(a) need only be plausible." *Betzner*, 910 F.3d at 1014. A defendant "need not win his case before he can have it removed." *Willingham*, 395 U.S. at 407; *see Ruppel*, 701 F.3d at 1182 ("[T]his requirement . . . encapsulates Congress's desire to have federal defenses litigated in federal forums. . . . Requiring the defense only to be colorable, instead of 'clearly sustainable,' advances that goal." (quoting *Willingham*, 395 U.S. at 407)); *Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994) ("A federal defendant need not show that he is entitled to *prevail* in order to have access to the federal forum."); *see also Bennett*, 607 F.3d at 1089; *Isaacson*, 517 F.3d at 139. "[T]he defense need not be 'clearly sustainable' to justify removal as merely 'colorable.'" *In re AFFF*, 2019 WL 2807266, at *3; *see Nessel*, 2021 WL 744683, at *4 ("Defendants need not completely prove the validity of this defense; they must only show that the defense is plausible." (citing *Bennett*, 607 F.3d at 1089)). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116 (citing *Kircher v. Putnam Funds Tr.*,

547 U.S. 633, 644 n.12 (2006)).[13] Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted); *see also Ruppel*, 701 F.3d at 1182 ("At this point, we are . . . concerned with who makes the ultimate determination, not what that determination will be. . . . The validity of the defense will present complex issues, but the propriety of removal does not depend on the answers." (internal quotation marks omitted)).

44.    Under the government contractor defense, the defendant is not liable for alleged defects or negligence with respect to military equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988); *see also, e.g.*, *Baker*, 962 F.3d at 946; *Betzner*, 910 F.3d at 1016.

45.    3M has satisfied these elements for purposes of removal. As discussed above, Naval Sea Systems Command approved reasonably precise specifications, governing MilSpec AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. 3M's products appeared on the DOD Qualified Products List, which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec. *See Ayo*, 2018 WL

---

[13]    *See also Kraus v. Alcatel-Lucent*, Civil Action No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense." (citations omitted)).

4781145, at *13 ("[T]here is colorable evidence that Manufacturing Defendants' Mil-Spec AFFF is not a stock product and that the government approved reasonably precise specifications requiring them to use PFCs, including PFOS and PFOA, in their products."); *see also id.* ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); *In re AFFF*, 2019 WL 2807266, at *2 (finding that defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications").

46.     Moreover, the government was adequately informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contain PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or health issues.[14] For example, in October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from fire-fighting exercises are considered to have adverse effects environmentally."[15] More recently, in a November 2017 report to Congress, the Department of Defense acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, it still described AFFF

---

[14]     *See, e.g.*, EPA, Revised Draft Hazard Assessment of Perfluorooctanoic Acid and its Salts, at 1-6 (Nov. 4, 2002) (excerpt).

[15]     *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), http://www.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[16] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants," and recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[17] *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); *In re AFFF*, 2019 WL 2807266, at *2 ("As to whether [Defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [Defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . .").

47.     At a minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation and other specifications of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *Twinam v. Dow Chem. Co. (In re "Agent Orange" Prod. Liab. Litig.)*, 517 F.3d 76, 90 (2d Cir. 2008); *see also Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1001 (7th Cir. 1996) ("*Boyle* does not require the contractor to warn the government of every possible danger—only those known to it and not the government."); *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990, 2011 WL 5109532, at *5 (S.D.N.Y. Oct. 21, 2011) ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about

---

[16]     Dep't of Defense, Aqueous Film Forming Foam Report to Congress 1-2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/y5un3zq8.

[17]     MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

the hazards of the product.'" (citation omitted)). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89-90; *see also Oliver*, 96 F.3d at 1001-1002; *Ayo*, 2018 WL 4781145, at *13.

     48.    In short, 3M has met its burden to remove the case—in accordance with other decisions addressing motions to remand in PFAS litigation—"by alleging that the Government provided specifications for MilSpec AFFF, that [its] AFFF conformed to those specifications, and that [it was] not aware of any dangers unknown to the Government. Whether these facts are true is not for this Court to determine at this stage. The Court need only consider whether the defense is plausible; it is." *Nessel*, 2021 WL 744683, at *4.

     WHEREFORE, 3M hereby removes this action from the State of Illinois Circuit Court of the Fourteenth Judicial Circuit, Rock Island County, to this Court.

Dated: April 21, 2022               Respectfully submitted,

                               */s/ Richard F. Bulger*
                               Richard F. Bulger (IL Bar No. 6220636)
                               MAYER BROWN LLP
                               71 South Wacker Drive
                               Chicago, IL 60606
                               (312) 782-0600
                               rbulger@mayerbrown.com

                               *Counsel for Defendant 3M Company*

## CERTIFICATE OF SERVICE

I certify that on April 21, 2022, I caused true and correct copies of the foregoing Notice of

Removal, with its Exhibits, to be served on counsel for Plaintiff by first class mail and email at the

addresses indicated below.

Stephen J. Sylvester
Gerald Karr
Ellen F. O'Laughlin
Karen Howard
OFFICE OF THE ILLINOIS ATTORNEY GENERAL
Environmental Bureau
69 West Washington Street, Suite 1800
Chicago, IL  60602
stephen.sylvester@ilag.com
gerald.karr@ilag.gov
ellen.olaughlin@ilag.com
karen.howard@ilag.com

Adam J. Levitt
Daniel Rock Flynn
Amy E. Keller
Diandra Debrosse Zimmerman
Anna Claire Skinner
Special Assistant Attorneys General
DiCELLO LEVITT GUTZLER LLC
Ten North Dearborn Street, Sixth Floor
Chicago, IL  60602
alevitt@dicellolevitt.com
dflynn@dicellolevitt.com
akeller@dicellolevitt.com
fu@dicellolevitt.com
askinner@dicellolevitt.com

Gregory M. Utter
Joseph M. Callow, Jr.
Special Assistant Attorneys General
Sarah V. Geiger
Collin L. Ryan
Matthew M. Allen
Joseph B. Womick
KEATING MUETHING & KLEKAMP PLL
1 East 4th Street, Suite 1400
Cincinnati, OH 45202

gmutter@kmklaw.com
jcallow@kmklaw.com
sgeiger@kmklaw.com
cryan@kmklaw.com
mallen@kmklaw.com
jwomick@kmklaw.com

Richard W. Fields
Martin Cunniff
Special Assistant Attorneys General
FIELDS PLLC
1700 K. Street NW, Suite 810
Washington, DC 20006
fields@fieldslawpllc.com
martin.cunniff@fieldslawpllc.com

*Counsel for Plaintiff*

*/s/ Richard F. Bulger*
Richard F. Bulger